IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND (Greenbelt)

GEORGIA ROGERS, et al.,　　　　　*

　　　Plaintiffs,　　　　　*

v.　　　　　*　　　CIVIL ACTION NO.
　　　　　　　　8:14 CV-02940-PWG
HOUSING AUTHORITY OF PRINCE　*
GEORGE'S COUNTY, et al.,
　　　　　*
　　　Defendants.

\* \* \* \* \* \* \* \* \*　　　*　\* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OR IN THE
ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

　　　Defendants, Housing Authority of Prince George's County("HAPGC") and its Executive Director Eric C. Brown by their attorney, Carrie Blackburn Riley, request the Court to dismiss with prejudice the actions against them pursuant to Federal Rule 12(b)(6), for failure to state a claim and/or Federal Rule 12(c) motion for judgment on the pleadings, or in the alternative, for summary judgment pursuant to Rule 56.

<u>INTRODUCTION</u>

　　　Plaintiffs assert two counts against the two captioned Defendants.  In Count I, Plaintiffs allege Defendants denied them their Federal right to due process by violating Regulatory Procedure and HAPGC's 2014 Agency Plan when it made significant amendments or modifications without allowing proper notice and comment to its Annual Plan.  In Count II, Plaintiffs allege the same actions violated their State Due Process Rights.  Defendants assert as a matter of law that Plaintiffs have no standing to bring their claims and their claims are deficient as a matter of law based upon the facts pled.  In the alternative, Defendants move for summary judgment.

Plaintiffs have no private due process right to control how subsidy is determined generally even if that policy decision has a trickle down effect on them as individuals.  The changes about which Plaintiffs complain are not significant as defined in the Plan and do not require the procedural notice and comment process that Plaintiffs' claim.  Plaintiffs alleged damages if any were harmless as they would have occurred even if Defendants had followed the procedure about which Plaintiffs complain.  Plaintiffs have also failed to satisfy the notice provision of the Local Government Tort Claims Act, which is a prerequisite to a Maryland constitutional tort claim.   Plaintiffs have further failed to allege any wrong doing by the Brown as executive director.   Accordingly, Plaintiffs' claims for declaratory judgment, injunctive relief and other damages should be dismissed as a matter of law.

## FACTS

HAPGC administers a Housing Choice Voucher Program (HCVP), which is a tenant based rental assistance program in which participants receive vouchers to receive monthly Housing Assistant Payments (HAP).  Doc No. 1 ¶¶ 15-17.  Under that program, HAPGC must "conduct a reexamination of family income and composition" for purposes of determining an appropriate amount of subsidy amount.  Doc No. 1 ¶ 18.  The Quality Housing and Work Responsibility Act ("QHWRA") requires that Public Housing Authorities (PHAs) submit an Annual Plan.   Doc No. 1 ¶¶19-20.  Petitioner summarizes:

> 22.  QHWRA directs that a PHA may modify its Annual Plan at any time, but that it may not institute "a significant amendment or modification" to its Plan until (1) that amendment or modification is adopted at a meeting of the PHA's board of directors that is open to the public, and (2) HUD is notified of and approves the amendment of modification.  *See* 42 U.S.C. § 1437-c-1(g)(1).

Doc No. 1 ¶22.

> QHWRA further requires that a PHA consult with a Resident Advisory Board prior to making any significant amendment or modification to an Annual Plan. *See* 42 U.S.C. § 1437c-1(g)(2)(A) and that any such significant amendments or modifications must be subject to public hearing, notice of which must be provided by the PHA not less than 45 days prior to the date upon which the hearing is to occur.   *See* 42 U.S.C. § 1437c-1(g)(2)(B). . . .

Doc No. 1 ¶23.  HUD has implemented regulations to the same effect.  Doc No. 1 ¶¶ 21, 24, 25.

 HAPGC's Annual Plan also required consultation with the Resident Advisory Board, a public review period, and notification to and approval from HUD.  Doc No. 1 ¶ 33.  Furthermore, and overlooked by Plaintiffs, HAPGC was also required to follow the same procedure for its Administrative Plan, which focused more specifically on the HCVP about which these Plaintiffs concern themselves.

> § 982.54 Administrative plan.
>
> (a) The PHA must adopt a written administrative plan that establishes local policies for administration of the program in accordance with HUD requirements. The administrative plan and any revisions of the plan must be formally adopted by the PHA Board of Commissioners or other authorized PHA officials. The administrative plan states PHA policy on matters for which the PHA has discretion to establish local policies.
>
> (b) The administrative plan must be in accordance with HUD regulations and requirements. The administrative plan is a supporting document to the PHA plan (part 903 of this title) and must be available for public review. The PHA must revise the administrative plan if needed to comply with HUD requirements.
>
> (c) The PHA must administer the program in accordance with the PHA administrative plan.

24 CFR § 982.54 .

Plaintiffs allege that the HAPGC's 2014 Agency Plan directed that Section 8 payment standards were at 100% of Fair Market rents and the Minimum Rents for Section 8 was $0.   Doc No. 1 ¶¶  29-30.  However, if you actually read the 2014 Agency Plan it states: "The Minimum rent for Section 8 is $0 **(The Authority will take under consideration the amount of**

**minimum rent to be charged for the Section 8 Program.**"  (Emphasis of all caps and bold in original).  Ex. 1 internal Ex. C, 2014 Agency Plan at 22.  The minutes from the Board meeting also make clear the intent to change the minimum rent.  See Ex. 1 internal Ex. B,  April 5, 2013 minutes.  Moreover, the 2013 Administrative Plan, which was the more detailed plan and already in place by the time the 2014 Agency Plan was under consideration, focused on HCVP operation, said:

> **6-III.A. OVERVIEW OF RENT AND SUBSIDY CALCULATIONS**
> **TTP Formula [24 CFR 5.628]**
> HUD regulations specify the formula for calculating the total tenant payment (TTP) for an assisted family. TTP is the highest of the following amounts, rounded to the nearest dollar:
> * * *
> · A minimum rent between $0 and $50 that is established by the PHA
> The PHA has authority to suspend and exempt families from minimum rent when a financial hardship exists, as defined in section 6-III.B.
> The amount that a family pays for rent and utilities (the family share) will never be less than the family's TTP but may be greater than the TTP depending on the rent charged for the unit the family selects.
> **Welfare Rent [24 CFR 5.628]**
> Welfare rent does not apply in this locality.
> **Minimum Rent [24 CFR 5.630]**
> The minimum rent for this locality is $50.

Ex. 1 internal Ex. A, 2013 Admin. Plan at 6-49.

Plaintiffs assert that HAPGC's Board improperly entered a resolution on June 24, 2013 amending the 2014 Annual Plan enacting cost-savings measures.  Doc No. 1 ¶¶ 59-60, 63.  Plaintiffs assert that HAPGC did not satisfy the procedural requirements, including notice and comment, necessary for a significant amendment to its administration of the HCVP.  Doc No. 1 ¶¶59-60, 63. They assert:

> By failing to comply with . . . requirements prior to its implementation of the cost-saving measures, HCVP participants were denied adequate notice, as required by

> statute and regulation, prior to a substantial change in their rental subsidy
> amounts.  Moreover, HAPGC exacerbated the errors in its implementation of the
> cost-saving measures by delaying notification to HCVP participants.   HAPGC
> did not actually mail or otherwise transmit the July 23, 2013 letter outlining the
> cost-saving measures to any HCVP participants at the time that it was prepared.
> Instead, on information and belief, HCVP participants are receiving copies of the
> July 23, 2103 letter at the time of, or sometimes after, their annual
> reexaminations.

Doc No. 1 ¶¶ 43-46.  Plaintiffs allege that HAPGC improperly claims the cost saving measures

identified in the July 23, 2013 letter were not "significant amendments" to its 2014 Annual Plan

necessitating compliance with notice, hearing, review and approval requirements and that HUD

mandated those measures   Doc No. 1 ¶¶ 52-53.

Citing Director of HUD's HCVP April 26, 2013 letter to PHA directors generally

regarding funding shortfalls, Plaintiffs claim HUD did not include as cost savings measures a

number of the cost-saving measures implemented by HAPGC, including the minimum rent,

change in occupancy standards or application of reduced fair market rents, all of which allegedly

resulted in reduced housing subsidies.  Doc No. 1 ¶¶ 55-56.  Although Plaintiffs acknowledge

that on June 17, 2013, HAPGC applied for HUD shortfall funding, Plaintiffs ignore that HAPGC

had been working closely with HUD and had HUD approval to enforce and implement cost-

saving efforts.  Doc No. 1 ¶¶ 58. See Ex. 1 internal Ex. E & F.   In fact, HUD staff was aware of

and approved the cost savings measures as set forth in Carol Warren's April 3, 2013 email to

HAPGC which summarized the efforts in part:

- PHA to ensure reasonable rents are reasonable
- PHA to amend their Admin Plan decreasing their interim re-exams policy from
30 to report income changes to 10 days.  Families should be terminated for
program violations

- •   PHA currently has no minimum rent. PHA to amend their admin plan to include a minimum rent of $50. PHA currently has over 600 families who are paying $50 or less
- •   The PHAs current Occupancy standards are based on the regulations of 2 people per bedroom. PHA to start with May re-exams and enforce their occupancy policy. A review of just the 3 person/3 bedroom voucher shows the PHA has over 600 families.

See Ex. 1 internal Ex. E.   See also April 9, 2013 Email of HAPGC staff person Mary Wheeler summarizing HUD's directions, attached hereto as Ex.1 internal Ex. F.

On July 9, 2013 and July 17, 2013, an HAPGC Program Manager notified its Rental Assistance Division that the payment and occupancy standard would be effective October 1, 2013, as well as impose minimum rents effective September 1, 2013.  Doc No. 1 ¶64. Thereafter on July 26, 2013, an email provided the July 23, 2013 letter and direction to the Rental Assistance Division to provide the letter to landlords and clients as interim and annual reexaminations are processed.  Doc No. 1 ¶65,  Ex. I.

Plaintiffs allege that as identified in the July 23, 2013 letter, HAPGC increased minimum rent from zero to a minimum of $50, reserved the right to deny portability moves, imposed new occupancy standards indicating the number of bedrooms used to calculate the participant's voucher and subsidy effective the next annual re-certification after October 1, 2013.  Doc No. 1 ¶ 37.   However as set forth in the 2013 Administrative Plan, the cost saving measures and occupancy standards were not changes to the plan, but more accurately statements to require enforcement of the plan.  Regarding minimum rent, see Ex. 1 internal Ex. A, 2013 Admin. Plan at 6-49.  Plaintiffs assert there was a change to the occupancy standards however, a review of the Administrative Plan in 2013 shows the occupancy language was always the same:

**5-II.B. DETERMINING FAMILY UNIT (VOUCHER) SIZE [24 CFR 982.402]**
For each family, the PHA determines the appropriate number of bedrooms under the PHA
subsidy standards and enters the family unit size on the voucher that is issued to the
family. The family unit size does not dictate the size of unit the family must actually
lease, nor does it determine who within a household will share a bedroom/sleeping room.
The following requirements apply when the PHA determines family unit size:

The subsidy standards must provide for the smallest number of bedrooms needed to
house a family without overcrowding.
· The subsidy standards must be consistent with space requirements under the housing
quality standards.
· The subsidy standards must be applied consistently for all families of like size and
composition.
· A child who is temporarily away from the home because of placement in foster care is
considered a member of the family in determining the family unit size.
· A family that consists of a pregnant woman (with no other persons) must be treated as a
two person family.
· Any live-in aide (approved by the PHA to reside in the unit to care for a family member
who is disabled or is at least 50 years of age) must be counted in determining the family
unit size;
· Unless a live-in aide resides with a family, the family unit size for any family consisting
of a single person must be either a zero- or one-bedroom unit, as determined under the
PHA subsidy standards.

**The PHA will assign one bedroom for each two persons within the household,
except in the following circumstances:**
Live-in aides will be allocated a separate bedroom.
Single person families will be allocated one bedroom.
The PHA will reference the following chart in determining the appropriate voucher size
for a family:
Voucher Size Persons in Household
(Minimum – Maximum)
1 Bedroom 1-2
2 Bedrooms 2-4
**3 Bedrooms 3-6**
4 Bedrooms 4-8
5 Bedrooms 6-10

See Ex. 1 internal Ex. A 2013, Admin Plan at 5-10 (bold emphasis added).   Contrary to

Plaintiffs' allegation that HAPGC changed to assign one bedroom for each two persons, it was

that way at least as early as July 1, 2012 when the 2013 Administrative Plan went into effect and well before the cost-saving efforts detailed in the July 2013 letter.

Plaintiffs do not allege the portability change had any affect on the Plaintiffs in this case. See generally  Doc No. 1.

Plaintiffs assert "the cost-saving measures ...constituted 'significant amendment[s] or substantial deviations to HAPGC's 2014 Agency Plan.'"  Doc No. 1 ¶ 38.  Plaintiffs allege that by raising minimum rents from zero to $50 and changing how the number of bedrooms are established for determining housing assistance payments, HAPGC made a significant amendment or modification to its Annual Plan that should have gone through an established approval process that included:  public notice, consultation with the Resident Advisory Board, public review and comment, adoption by HAPGC's Board of Commissioners in an opening meeting,  notification to HUD and HUD's approval.   However, Plaintiffs again ignore that the 2013 Administrative Plan, which is the more detailed plan specific to HAPGC's HCVP, went through the necessary public review and comment process and that earlier Administrative Plan contained the language about which these Plaintiffs claim they were denied their notice and comment opportunities.

 Plaintiffs do not allege that if the process had been followed as Plaintiffs desire the outcome would have been different such that the minimum rent would not have been raised, the occupancy standards not enforced or fair market rents not modified.

Plaintiffs complain that the July 23, 2013 cost savings letter is being received by HCVP participants at the time of or sometimes after their annual reexamination.  Doc No. 1 ¶ 46. Rogers asserts she received the cost savings measures letter in mid- January 2014, which

resulted in an increase in her rent on February 1, 2014.   Doc No. 1 ¶ 48.  Ross received it in

May 2014, but she states her rent was increased in part as a result of the cost-saving measures,

on February 2, 2014.   Doc No. 1 ¶ 49.  Plaintiffs do not allege that HAPGC's circulation of the

notice letter in conjunction with each re-certification violates any law or right or that HAPGC

had any obligation to circulate the letter any earlier than they did.

By letter dated January 13, 2014, HAPGC notified Rogers that her monthly HAP would

be decreased "effective February 1, 2013," [sic] the notice included a copy of the July 23, 2013

cost-savings letter.  Doc No. 1 ¶¶ 77-78.  By letter dated February 11, 2014, she was advised the

HAP would be decreased again effective April 1, 2014.  Doc No. 1 ¶ 79.  She asserts as a result

she was responsible for an increased $396 per month.  Doc No. 1 ¶ 80.

Plaintiffs explain that prior to implementation of the cost-savings measures, Ross, with

her five children, lived in a four bedroom residence for which HAPGC paid the full $1,900

contract rent, plus a $621 utility allowance.  Doc No. 1 ¶¶ 83-84.  Plaintiffs assert that in a letter

dated January 1, 2014, HAPGC notified Ross that effective February 1, 2014, her monthly HAP

would be reduced to $1,710, with no utility reimbursement.  Plaintiffs assert this new amount

was calculated using a three bedroom instead of four bedroom voucher.[1]  Doc No. 1 ¶85.   On

July 1, 2014, HAPGC terminated the HAP with Ross's landlord due to the landlord's failed

housing inspections and gave Ross a voucher to move.  Ross complains that she is having

difficulty finding suitable housing due to the reduced size of her voucher and payment standard

imposed.  Doc No. 1 ¶ 86.

Plaintiffs assert they had a property interest in their HAP calculated in accordance with

---

[1] Plaintiffs do not discuss the utility allowance change.

the statutes and regulations governing Section 8 program and HCVP.   Doc No. 1 ¶ 90.   They

claim they were denied due process when HAPGC did not comply with the requirements of

QHWRA for implementing a "Significant amendment or modification" to an agency plan,

HUD's regulations and HAPGC's own 2013 Agency Plan.   Doc No. 1 ¶ 92.   Plaintiffs ignore

completely that HAPGC did not modify its 2013 Administrative Plan, which already gave them

the right to do everything they made clear in their cost-saving letter and resolution.

<u>STANDARD OF REVIEW</u>

The purpose of a motion under Federal Rule of Civil Procedure 12(b)(6) is to test the

bare legal sufficiency of a Complaint.   Except in certain specified cases, a plaintiff's complaint

need only satisfy the "simplified pleading standard" of Rule 8(a) which requires a "short and

plain" statement of the claim showing that the pleader is entitled to relief.   <u>Johnson v MV</u>

<u>Transp. Inc.</u>, 716 F.Supp.2d 410, 413 (D.Md. 2010)(internal citations omitted).   Nevertheless,

Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief.

<u>Id.</u> (internal citations omitted).   That showing must consist of more than "a formulaic recitation

of the elements of a cause of action" or "naked assertion[s] devoid of further factual

enhancement." <u>Id.</u>

"[I]mportantly, [a Rule 12(b)(6) motion] does not resolve contests surrounding the facts,

the merits of a claim, or the applicability of defenses." <u>Republican Party of North Carolina v.</u>

<u>Martin</u>, 980 F.2d 943, 952 (4th Cir. 1992).   Thus, in reviewing a Rule 12(b)(6) motion, the Court

should accept all well-pleaded allegations in a plaintiff's complaint as true and draw all

reasonable inferences from those facts in the plaintiff's favor.   If it appears certain that the

plaintiff cannot prove any set of facts in support of his or her claims entitling plaintiff to relief,

the defendant's Rule 12(b)(6) motion should be granted.  Edwards v. City of Goldsboro, 178

F.3d 231, 243-44 (4th Cir. 1999).  In reviewing a 12(b)(6) motion, however, the Court is not

required to accept as true legal conclusions set forth in a plaintiff's complaint.  See District 28,

United Mine Workers of America, Inc. v. Wellmore Coal Corp., 609 F.2d 1083, 1085 (4th Cir.

1979).  Additionally, "[w]here the well-pleaded facts do not permit the court to infer more than

the mere possibility of misconduct, the complaint has alleged, but it has not shown that the

pleader is entitled to relief."  Johnson, 716 F.Supp.2d at 413 (quoting Ashcroft v Igbal, 129 S.Ct.

1937 (2009)).  Thus, determining whether a complaint states a plausible claim for relief will be a

context-specific task that requires the reviewing court to draw on its judicial experience and

common sense.  Id.  Finally, to the extent that the Court considers matters outside the pleadings,

a motion to dismiss under Rule 12(b)(6) must be treated as one for summary judgment.  Rule

12(d)(2012).

<u>ARGUMENT</u>

I.  <u>Plaintiffs' Lack Standing to Seek Relief</u>

      Although Plaintiffs claim their due process was denied, the  Housing Act does not allow

Plaintiffs a private remedy to seek redress for their claim regarding HAPGC's alleged failure to

follow the proper administrative process to raise minimum rents, modify occupancy standards

and other related changes.

> It is true that the Housing Act does not, itself, contain an express private right of
> action, and courts have held that it does not support direct implication of a cause
> of action. See *Perry v. Hous. Auth. of City of Charleston,* 664 F.2d 1210,
> 1211–17 (4th Cir.1981). However, the Supreme Court has held that particular
> provisions of the Housing Act, which provide residents of public housing with
> "specific or definable rights" that are not "beyond the competence of the judiciary
> to enforce," are "enforceable rights under ... [42 U.S.C.] § 1983."

Sager v Housing Comm's of Anne Arundel Co., 855 F.Supp.2d 524, 547 (D. Md. 2012).   In

Sager, the plaintiff's complaint related to her personal disability and her request for a reasonable

accommodation.   Unlike Sager, where the right complained about was Sager's personal right to

a reasonable accommodation, the Plaintiffs here complain about the process followed to

implement a change to HAPGC's Agency Plan.  The rights complained about are not personal

but are more general.  They do not claim the change to the Agency Plan itself violated any law

but complain instead about how the process was deficient.  Plaintiffs also ignore that HAPGC's

Administrative Plan already allowed the cost savings measures about which the Agency Plan

was changed to be more focused.  The procedural harm about which they complain is not theirs

to raise and not their role to remedy: HUD has the exclusive right to enforce.  Plaintiffs have a

right to complain to HUD, but only HUD is the enforcer:

> § 903.25 How does HUD ensure PHA compliance with its plan?
> A PHA must comply with the rules, standards and policies established in the
> plans. To ensure that a PHA is in compliance with all policies, rules, and
> standards adopted in the plan approved by HUD, HUD shall, as it deems
> appropriate, respond to any complaint concerning PHA noncompliance with its
> plan. If HUD should determine that a PHA is not in compliance with its plan,
> HUD will take whatever action it deems necessary and appropriate.

 24 C.F.R. §903.25.  Accordingly, these Plaintiffs have no private remedy under the Housing

Act.

This case is more akin to New York City Hous. Auth., 983 N.Y.S.2d 204(Sup. Ct 2013),

which found that the petitioners lacked a private right of action to challenge the housing

authority's alleged failure to describe an initiative in its annual plan, There, the New York Court

explained:

The Housing Act's implementing regulations provide that if HUD's Secretary

determines that a public housing agency is not in compliance with the annual plan, "it shall take such actions as the Secretary determines to be appropriate to ensure such compliance." 24 C.F.R. §903.25. It is well settled that "the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." Cannon v. Univ. of Chicago, 441 U.S. 677, 688, 99 S.Ct.1946, 60 L.Ed.2d 560 (1979). "The question whether a statute creates a cause of action, either expressly or by implication, is basically a matter of statutory construction." Transamerica Mortg. Advisors, Inc. v. Lewis, 444 U.S. 11, 15, 100 S.Ct.242, 62 L.Ed.2d 146 (1979). Courts have routinely found that no private right of action exists under the Housing Act. See Renaissance Equity Holdings LLC v. Donovan, 2013WL 2237547 at*5 (E.D.NY May 21, 2013)("[t]here is no private right of action under the Housing Act ...."); see alsoThomas v. Butzen, 2005 WL 2387676 (N.D.Ill.2005)(finding that "section 1437c–1 ... does not suggest Congressional intent to confer enforceable rights on plaintiffs. The section says nothing about a private right of action, and its focus is on public housing agencies' responsibility to report to HUD, not on their responsibilities to their tenants."); see also Shell v. HUD, 2009 WL 4298757 at *2 (11th Cir. Dec.2, 2009)(affirming the district court's holding "that neither 24 C.F.R. 903.25 nor 42 U.S.C. § 1437c–1 provide a private right of action"); see also Copeland v. United States, 622 F.Supp.2d 1347 (S.D. Fla.2008)(observing that under 42 U.S.C. § 1437c–1, whether a housing authority violates its annual plan is a question for HUD to determine in its discretion).

*5 In the instant action, this court agrees with the well-settled law that petitioners do not have a private right of action to challenge NYCHA's alleged failure to sufficiently describe the Land Lease Initiative in its 2013 Annual Plan. The Housing Act does not address enforcement of an annual plan and, by its plain terms, does not create individual rights. Although the broad purpose of the Housing Act may be directed at ensuring adequate, habitable housing for low-income families, the focus of § 1437c–1 is on regulating the contents of NYCHA's annual and five-year plan submissions and thus focuses on the regulated entity rather than on the individuals protected. Therefore, that portion of the petition must be denied.

New York City Council v. New York City Hous. Auth., 983 N.Y.S.2d 204(Sup. Ct 2013) Slip

Op. 52052 at 4.  See also Shell v. HUD, Hollywood Housing Authority, 355 Fed. Appx 300 (11th

Circuit, Dec 2009)(tenant initiated a Fair Housing complaint against HUD and HHA. The

plaintiff had complained to HUD under section 1437c-1 and 24 CFR 903.25, but was unhappy

with HUD's "failure to investigate" whether or not the HHA had violated its PHA Plan. The

court found that HUD's actions under both section 1437c-1 and 24 CFR 903.25 are committed to "agency discretion by law," and the Court would not review HUD's actions); <u>Copeland v. United States</u>, 622 F. Supp. 2d 1347 (S.D. Fl, Dec 2008) (tenant sued as a result of her termination of Section 8 benefits. The court here also found that under Section 1437c-1 and 24 CFR §903.25 "HUD's oversight of the local public housing authority is committed to agency discretion," and it was inappropriate for the court to review the actions HUD took in response to the plaintiff's complaint against the Housing Authority); <u>Thomas v. Butzen</u>, 2005 WL 2387676 (N.D Il, Sept 2005) (plaintiffs sued Chicago Housing Authority alleging violations of Section 1437c-1(d)(16) (which requires the PHA to certify that it is meet federal requirements, including to affirmatively further fair housing).  The court held that the Section 1437c-1 does not provide the plaintiffs with enforceable rights, but instead focuses on the public housing agencies responsibilities to report to HUD).

Plaintiffs have no right to stop HAPGC from implementing the cost-saving measures.  At most they have the right to comment on the plan and hope to sway HAPGC to change its plan. As explained, the Housing Act does not anticipate enforcement of the procedures to modify a plan by individuals and does not create a private remedy by individuals. Enforcement of the Act is by HUD.

II.     <u>No Significant Amendment or Modification Occurred</u>

HAPGC is only bound to follow the notice comment procedure when the change involves a significant amendment or modification to certain defined items:  Here HAPGC's resolution restating in large part the 2013 Administrative Plan with no actual change did not implement a significant amendment or modification.  A significant modification is defined as

"changes to rent or admission policies or organization of the waiting list."  <u>See</u> Ex. 1 internal Ex. C at p 59.

The Annual Plan set parameters and allowed flexibility, but HAPGC's 2013 Administrative Plan was more specific and already allowed the cost savings measures about which the Plaintiffs' complain.  Accordingly, the resolution was directed to the Adminstrative Plan, not the Annual Plan, and was insignificant.  Review of the resolution refers to changing the Administrative Plan, not the Agency Plan.  <u>See</u> Doc No. 1 Ex. F.  Moreover, HAPGC did not change rent as that term is commonly understood but how HAPGC calculated what share the tenant contributed towards rent and how many bedrooms the agency would provide subsidy towards.

As noted above, HAPGC did not change its Administrative policy on minimum rents, it simply started applying what it always had the right to do: impose a minimum rent of $50.  <u>See</u> Ex. 1 internal Ex. A, 2013 Admin. Plan at 6-49.  HAPGC's April 2013 minutes regarding the 2014 Annual Plan reflect that it was the board's intent to evaluate minimum rents.  <u>See</u> Ex. 1 internal Ex. B.  Furthermore, the 2014 Annual Plan actually stated that intended flexibility: "The Minimum rent for Section 8 is $0 **(The Authority will take under consideration the amount of minimum rent to be charged for the Section 8 Program.**"  (Emphasis of all caps and bold in original).  <u>See</u> Ex. 1 internal Ex. C, 2014 Agency Plan at 22.

Plaintiffs' concerns regarding occupancy standards do not relate to rent policies but to the bedroom size of the voucher given a household and are by definition not significant changes warranting the notice comment process.  Occupancy standards are addressed in an entirely different section of the Administrative Plan.  <u>Compare</u> Ex. 1 internal Ex. A, 2013 Admin. Plan

15

at 5-10 and 6-49.  Moreover, Plaintiff's complaints regarding occupancy standard are also misleading because again HAPGC did not change its policy, it simply began to enforce a policy that had been in place before.  Plaintiffs' complaint regarding portability have nothing to do with rent policies or any other ground covered by the definition.  None of the cost-saving measures involved significant amendments to rent policies; accordingly, as a matter of law, HAPGC did not have any obligation to follow the notice comment process before amending its Annual Plan to be more detailed and echo its Administrative Plan.

III.   Cost-Saving Measures were not Improper and Any Procedural Error was Harmless

The errors if any were harmless and if followed would not have avoided the cost-saving measures.  Plaintiffs claim that HAPGC did not give the public the requisite notice, time to comment, etc., however Plaintiffs do not allege they would have commented anyway such that their personal right to participate was adversely affected or that any particular comment would have prevented the passage of the resolution and cost savings measures.  The 2013 Administrative Plan, which Plaintiffs do not challenge, and which already contained the cost-saving measures, only drives homes the point that the points made in the resolution were minor and of no practical consequence as the same cost saving options for HAPGC were already permissible as early as July 1, 2012 when the 2013 Administrative Plan went into effect.

Plaintiffs do not allege that had the notice, review, and comment activities occurred the cost-savings measures would not have been passed anyway, nor can they allege that as they were already passed a year earlier with the 2013 Administrative Plan.  Importantly, the Plaintiffs did not comment when all of the cost savings measures were published and made available for public comment in conjunction with the 2015 annual plan.  For that matter no one commented

16

on the cost saving measures raised in Plaintiffs' complaint.   <u>See</u> Ex. 1 internal Ex. D.

Nor do Plaintiffs allege that HAPGC's cost-savings measures were in themselves in violation of any law.  As a result, Plaintiffs' claim, if anything, could succeed only to briefly delay the inevitable passing, which occurred in accord with all the notice comment and other procedural requirements when the 2015 Agency Plan went into effect July 1, 2014.

IV.    <u>Plaintiffs Fail to State a Due Process Claim under the Maryland Declaration of Rights</u>

For the same reasons Count I fails, Plaintiffs' assertion that they have been deprived their property rights in violation of the Maryland Declaration of Rights also fails.

V.    <u>Failure to Give Notice Under the LGTCA Bars Count II</u>

In Count II, Plaintiffs allege a violation of Article 24 of Maryland's Constitution.  <u>See</u> Doc 1, Count II.  That cause of action is subject to dismissal as a matter of law for Plaintiffs' failure to comply with the notice provisions of the Local Government Tort Claims Act ("LGTCA").  <u>See</u> Md. Code Ann., Cts. & Jud. Proc. § 5-304 (2013).  Under the LGTCA, unless a plaintiff complies with certain notice requirements, he is barred from bringing suit against a local government and its employees.  In this case, both Plaintiffs failed to give the required notice of their intent to bring claims against Defendant HAPGC or its Executive Director Brown.  Nor have Plaintiffs ever moved for good cause for their failure to give notice, as a result the burden never shifts to the Defendants to show prejudice by the lack of notice.

The Local Government Tort Claims Act ("LGTCA") set forth in Maryland Code Ann. Cts. & Jud. Proc. § 5-301 et seq., provides:

§ 5-304. Actions for unliquidated damages
* * *
(b) Notice required. --

17

(1) Except as provided in subsections (a) and (d) of this section, an action for unliquidated damages may not be brought <u>against a local government or its employees</u> unless the notice of the claim required by this section is given within 180 days after the injury.

(2) The notice shall be in writing and shall state the time, place, and cause of the injury.

* * *

Maryland Code Ann. Cts. & Jud. Proc. § 5-304 (emphasis added).  Maryland Code Ann. Cts. & Jud. Proc. § 5-301(d)(15) specifically identifies twenty eight different entities, each of which are considered a local government under the statute.  Housing Authorities as created under Maryland Housing and Comm. Dev. Code § 12-201 et seq., such as the Housing Authority of Prince George's County, are a listed type of local government and its employees are intentionally covered by the LGTCA.  Additionally, Plaintiff's claim against Brown is against him as an employee of HAPGC.  Under the LGTCA, a claimant must give notice of his intent to pursue a claim.

(b) Notice Required.–

(1)  Except as provided in subsections (a) and (d) of this section, an action for unliquidated damages may not be brought <u>against a local government or its employees</u> unless the notice of the claim required by this section is given within 180 days after the injury.

(2) The notice shall be in writing and shall state the time, place, and cause of the injury.

               * * *

(d) Waiver of notice requirement. –  Notwithstanding the other provisions of this section, unless the defendant can affirmatively show that its defense has been prejudiced by lack of required notice, <u>upon motion and for good cause</u> shown the court may entertain the suit even though the required notice was not given.

Md. Code Ann., Cts. & Jud. Proc. § 5-304 (2013) (emphasis added).

The Court of Appeals has repeatedly held that a plaintiff's failure to comply with the LGTCA is a failure to meet a condition precedent to suit, which stands as a complete bar to any

liability asserted against the local government.  In Rios v. Montgomery Co., 386 Md. 104, 872 A.2d 1 (2005), the Court of Appeals reiterated its earlier decisions, stating "we have expressly held that the LGTCA notice requirements are a condition precedent to maintaining an action against a local government." 386 Md. at 127, 872 A.2d at 14.  The Court further explained that "[w]e have previously defined a "condition precedent" as "a condition attached to the right to sue at all."  Rios, 386 Md. at 127, 872 A.2d at 14, citing Waddell v. Kirkpatrick, 331 Md. 52, 59, 626 A.2d 353, 356 (1993).

In the Court of Special Appeals recent decision Rounds v Maryland National Capital Park and Planning Commission, 214 Md.App. 90, 75 A.3d 987 (2012), it clearly found that the LGTCA applied to Article 24 claims, stating "[t]hus, a plaintiff may sue the Commission for a state constitutional tort only if the plaintiff complies with the LGTCA's conditions, including its notice requirement."  Rounds, 214 Md.App. at 107, 75 A.3d at 996-7. The Court noted a distinction between the different type of local governments but failed to extend its decision to address that distinction.  As noted by that Court in a footnote its "conclusion is supported by dicta in various cases that the LGTCA notice requirement applies to state constitutional torts. See, e.g., Ashton, 339 Md. at 107 n. 19, 660 A.2d 447; Ransom, 183 Md.App. at 579, 962 A.2d 1025; Hansen, 420 Md. at 682 n. 7, 25 A.3d 122." Rounds, 214 Md.App. at 107, 75 A.3d at 997 fn 10.

VI.    No Basis for Any Claim Against Brown

The two counts allege claims and seek relief generally against "Defendants," however, nowhere in the body of the Complaint does it ever identify any wrongful action or omission by Brown.  Brown is named in his official capacity as Executive Director of HAPGC, but there is

19

no substantive reference to him or his duties.  The Complaint states only that he is the executive director responsible for overseeing HAPGC's policies and operations.  <u>See</u> Doc. No. 1 Complaint ¶ 8.  It further states that he signed the July 24, 2013 letter that was to be sent out to landlords and participants in conjunction with their upcoming re-examinations.  <u>See</u> Doc. No. 1 Complaint ¶ 36.  Nowhere in the Complaint does it say he breached his duties to oversee or supervise.  Accordingly, all claims against Brown should be dismissed for failure to state a claim against him in his official capacity as a matter of law.

VII.   <u>No Right to Injunctive Relief</u>

Injunctive relief pursuant to Federal Rule of Civil Procedure 65 is inappropriate in this case.   For the reasons previously set forth Plaintiffs are not likely to succeed, moreover they will not suffer irreparable harm as their right to housing assistance has continued and will continue.  Their damages, if any, were unavoidable as the cost-savings measures are permissible and there is no allegation or evidence that if HAPGC had followed the notice, comment and review procedure the change could not have passed.  In fact, the undisputed evidence shows that the same cost-savings measures went into effect after proper notice and comment on July 1, 2014 in conjunction with the 2015 Annual Plan, such that the harm about which Plaintiffs complained was unavoidable in the ordinary course and that those same changes were already in place in the even earlier 2013 Administrative Plan.

Prior to the Supreme Court's 2008 decision in <u>Winter v. Natural Resources Defense Council</u>, 129 S.Ct. 365 (2008), courts in the Fourth Circuit and Maryland state courts looked to <u>Blackwelder Furniture Co. v. Selig Manufacturing Co.</u>, 550 F.2d 189, 194 (4th Cir. 1977) for the standard in granting injunctive relief.  <u>See</u> <u>Real Truth About Obama, Inc. v. Federal Election</u>

Commission, 575 F.3d 343 (4th Cir., 2009)(vacated on other grounds); see also Lerner v. Lerner,

306 Md. 771, 776, 511 A.2d 501 (1986).   In 2009, the Fourth Circuit, in Real Truth About

Obama, Inc. v. Federal Election Commission, 575 F.3d 343 (4th Cir. 2009), recognized the

tension between the Supreme Court's decision in Winter and the Fourth Circuit's 1977 decision

in Blackwelder.   In adopting the Winter decision, the Fourth Circuit changed the applicable

standard, making it even more difficult to obtain injunctive relief.   The Court explained:

> In its recent opinion in Winter, the Supreme Court articulated clearly what must
> be shown to obtain a preliminary injunction, stating that the plaintiff must
> establish "[1] that he is likely to succeed on the merits, [2] that he is likely to
> suffer irreparable harm in the absence of preliminary relief, [3] that the balance of
> equities tips in his favor, and [4] that an injunction is in the public interest."
> Winter, 129 S.Ct. at 374.  And all four requirements must be satisfied.  Id.
> Indeed, the Court in Winter rejected a standard that allowed the plaintiff to
> demonstrate only a "possibility" of irreparable harm because that standard was
> "inconsistent with our characterization of injunctive relief as an extraordinary
> remedy that may only be awarded upon a clear showing that the plaintiff is
> entitled to such relief." Id. at 375-76.... Our Blackwelder standard in several
> respects now stands in fatal tension with the Supreme Court's 2008 decision in
> Winter.

Real Truth About Obama, Inc., 575 F.3d at 346.   After Winter, regardless of the weight given

the other factors, Federal Courts are prohibited from granting the injunctive relief if the movant

cannot show the likelihood of succeeding on the merits.  All four factors must be established.

The Supreme Court in  Winter made clear, "[a] preliminary injunction is an extraordinary

remedy never awarded as of right.  Munaf, 553 U.S., at ----, 128 S.Ct., at 2218-2219."   Winter,

129 S.Ct. at 376.  Stating that "possibility" is too lenient a standard, the Court explained:

> We agree with the Navy that the Ninth Circuit's "possibility" standard is too
> lenient.  . . .  Issuing a preliminary injunction based only on a possibility of
> irreparable harm is inconsistent with our characterization of injunctive relief as an
> extraordinary remedy that may only be awarded upon a clear showing that the
> plaintiff is entitled to such relief. Mazurek v. Armstrong, 520 U.S. 968, 972, 117

S.Ct. 1865, 138 L.Ed.2d 162 (1997) (*per curiam).*

<u>Winter</u>, 129 S.Ct. at 375-76.

While Plaintiffs demand here is for permanent injunctive relief not temporary injunctive relief the facts are still the same.   Plaintiffs will not prevail on the merits.  They will not suffer any harm different than that which they would have in the ordinary course by following the 2013 Administrative Plan and/or the passage of the 2015 Annual Plan.  The equities do not tip in Plaintiffs' favor because without the cost-savings measures, HAPGC faced budget short falls and the prospect of terminating individual vouchers based on the lack of funding.  Accordingly, Plaintiffs cannot meet the burden of their case and their requested injunctive relief should be denied as a matter of law.

<u>CONCLUSION</u>

For the reasons and based upon the authorities cited herein, Defendants, Housing Authority of Prince George's County and Eric C. Brown, request that Plaintiffs' Complaint be dismissed in its favor all counts.

Respectfully submitted,

Carrie Blackburn Riley
Federal Bar No.22778
Blackburn Riley, LLC
828 Dulaney Valley Road, Suite 4
Baltimore, Maryland 21204
410-825-8088
410-321-4944 FAX
cbr@BlackburnRiley.com

Attorney for Defendants
Housing Authority of Prince George's
County and Eric C. Brown